## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHWESTERN DIVISION

JANET L. FORTNER     )
            )
    Plaintiff,    )
            )
  v.         )  Case No. 08-5066-CV-SW-NKL-SSA
            )
MICHAEL J. ASTRUE,    )
Commissioner of Social Security, )
            )
    Defendant.   )
            )

## ORDER

   Plaintiff Janet Fortner challenges the Social Security Commissioner's ("Commissioner") denial of her claim for disability insurance benefits for the period from September 28, 2002 to December 10, 2003. After a hearing, on May 27, 2004, an Administrative Law Judge ("ALJ") found that Plaintiff was not under a "disability" as defined in the Social Security Act ("Act"), 42 U.S.C. §§ 401, *et seq.,* during that period; the ALJ found that she was "disabled" from December 10, 2003, onward. The decision of the ALJ stands as the final decision of the Commissioner. Plaintiff seeks judicial review, petitioning for reversal of the ALJ's decision and an award of benefits. *See* 42 U.S.C. § 405(g). The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary. Because the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole, the Court denies Plaintiff's petition.

## I.    Factual Background[1]

Plaintiff alleged that she was disabled because of knee problems, a bulging disc in her back, fibromyalgia, depression, and other problems. Plaintiff was forty-eight years old on September 18, 2002, the date of her alleged onset of disability. She turned fifty on December 10, 2003. She has a high school education.

For over twenty years, from 1981 through her alleged onset date in September 2002, Plaintiff worked as a truck driver for the same company. Her income ranged from approximately $19,000 (in 1982) to approximately $50,000 (in 2001-2002).

### A.    Medical History

In January 2001, Plaintiff began seeing Dr. Michael Joseph for her arthritis. Records from February 2002 indicate that he was treating her for arthritis in her hands and degenerative joint disease of the cervical spine, lumbar spine, and left knee. Dr. Joseph noted his opinion that Plaintiff's symptoms were exacerbated by her work loads.

In February 2002, Dr. Joseph noted an x-ray of Plaintiff's left knee which showed joint narrowing and osteopenia. He advised her to "avoid some" of her work duties which exacerbated her complaints of knee pain. He also gave her a pain injection in her knee.

In July 2002, Dr. Joseph noted tenderness and crepitus on motion of Plaintiff's left knee, with swelling and small effusion.[2] Dr. Joseph reported that Plaintiff's pain occurred

---

[1] Portions of the parties' briefs are adopted without quotation designated.

[2] Effusion is an oozing of fluid from a tissue. Effusion. Dictionary.com. *The American Heritage Dictionary of the English Language, Fourth Edition.* Houghton Mifflin Co., 2004. http://dictionary.reference.com/browse/effusion (accessed Jan. 20, 2009).

2

at rest and with weight bearing and that she complained of pain, swelling, and stiffness in the left knee.

Later that month, Dr. Joseph noted that Plaintiff was having trouble with her right knee as well. A physical exam showed tenderness, crepitus on motion of the right knee, with swelling and effusion. Dr. Joseph drained the left knee and administered another pain injection. He injected the left knee again a week later.

Plaintiff was treated by Gregory L. Unruh, D.O., for various transient problems, such as a bout of sinus congestion and pink eye. In July 2002, a few months prior to her alleged onset, she told Dr. Unruh she had difficulty with bronchitis symptoms after "brush-hogging" a field earlier that day.

In August 2002, Dr. Joseph indicated that Plaintiff had advanced arthritis of the knees, left greater than right, with recurrent swelling and stiffness in both knees, with pain at rest as well as weight bearing. He drained both knees, but did not inject them, noting that prior injections showed no improvement. X-rays of both knees were similar to the February 2002 x-ray, but also showed moderate joint narrowing.

On approximately September 18, 2002, Dr. Joseph referred Plaintiff to Dr. Black, a surgeon. An MRI revealed a right torn medial meniscus, and Dr. Black performed arthroscopic surgery for that in October 2002.

Dr. Black's notes from an October 2002 follow-up visit state that Plaintiff was "getting along quite well. She [was] having minimal pain at this point." (R. at 111.) Dr. Black advised her to continue exercises and avoid bent knee activities, remaining off work.

3

By her next visit to Dr. Black in November 2002, he mentioned that her knee was still sore, but not as bad as before, and that it was getting along fairly well. Dr. Black noted that Plaintiff was on "light duty" at that point.

In November 2002, Dr. Joseph noted that Plaintiff did not have much relief from the surgery. Plaintiff told Dr. Joseph she had back pain, which was relieved by sitting down. Two weeks later, Dr. Joseph again noted Plaintiff's report of pain at rest, tenderness, swelling and bilateral effusion. He again drained both knees. A November 2002 x-ray of Plaintiff's spine showed mild osteopenia[3] and some spondylosis,[4] but no other abnormalities.

In December 2002, Plaintiff saw Dr. James Cole, who apparently practices with Dr. Black. She saw him with respect to complaints of back pain, which was aggravated by sitting for prolonged periods. Dr. Cole noted normal gait and full strength, as well as a slight spasm in Plaintiff's back muscles. Reviewing an x-ray and MRI scans of Plaintiff's back, Dr. Cole noted some abnormalities, such as joint space narrowing and slight bulging, but no signs of stenosis. Dr. Cole diagnosed "early degenerative changes" and advised that Plaintiff use anti-inflammatory drugs and change jobs. He told her to change positions as much as possible and maintain a home exercise program.

---

[3] Osteopenia is "A generalized reduction in bone mass that is less severe than that resulting from osteoporosis, caused by the resorption of bone at a rate that exceeds bone synthesis." Osteopenia. Dictionary.com. *The American Heritage® Dictionary of the English Language, Fourth Edition*. Houghton Mifflin Company, 2004. http://dictionary.reference.com/browse/osteopenia (accessed: January 21, 2009).

[4] Spondylosis is reduction in bone volume to below normal levels. Spondylosis. Dictionary.com. *Merriam-Webster's Medical Dictionary*. Merriam-Webster, Inc. http://dictionary.reference.com/browse/spondylosis (accessed: January 21, 2009).

4

Also in December 2002, Plaintiff reported to Dr. Black that her knee had not improved since the meniscus surgery. Dr. Black noted talking to Plaintiff at length, and that she was concerned about her ability to return to work and long-term disability. Dr. Black's examination of her knees was unremarkable though. Dr. Black opined that she could return to work.

In December 2002, Plaintiff reported to Dr. Unruh with abdominal complaints. She also told Dr. Unruh that her knees hurt and that she had difficulty getting in and out of her truck and operating the pedals.

In January 2003, Dr. Black sent Plaintiff to Dr. Joseph with swollen and painful knees. Dr. Joseph reported that Plaintiff was tearful, and said that she was going to lose her job and insurance in five weeks. Dr. Joseph advised Plaintiff to attempt to get Social Security disability. Later that month, Dr. Black performed arthroscopic meniscus surgery on Plaintiff's left knee, with some reparative surgery of her cartilage.

At the time of Plaintiff's interview at the Social Security Office in January 2003, an employee noted that Plaintiff had difficulty with sitting, standing and walking. The employee noted popping sounds that occurred when Plaintiff moved around, that Plaintiff walked with a limp, and that Plaintiff had to stand a couple of times during the interview.

In February 2003, Dr. Joseph noted that Plaintiff had severe pain in both knees and moderate pain in her back. He noted that physical exam showed tenderness, swelling, bilateral effusions, warmth, and crepitus on motion of the knees.

5

Also in February 2003, Plaintiff saw Dr. Black. His notes indicate that she was getting along well overall and that she stated her pain was better. Two weeks later, she told Dr. Black that her left knee hurt, as going to the grocery store and doing a lot of walking the day before had aggravated it. Dr. Black opined that the pain was still an aggravation of mild arthritis in her knee.

In May 2003, Dr. Joseph noted continued severe pain in both knees, tenderness, swelling, warmth and decreased flexion and extension.

In June 2003, Plaintiff saw Dr. David Ball, an orthopaedic surgeon. He noted progressing knee pain, and that standing and walking had become increasingly difficult for Plaintiff. Dr. Ball described significant joint narrowing on current x-rays. He noted osteoarthritic enlargement of both knees, with deformity, effusion, and medial to lateral instability in the left knee. Dr. Ball recommended a left total knee replacement.

In July 2003, Dr. Ball performed knee replacement surgery on Plaintiff. She was discharged from the hospital after walking with a walker and weight bearing. Dr. Ball's notes indicate that Plaintiff would receive physical therapy at home three times a week and use a passive motion machine.

In August 2003, Dr. Joseph noted severe pain in Plaintiff's right knee and mild pain in her left. He noted that Plaintiff also had osteoarthritis of the hand, degenerative joint disease of the spine and bulging disc, hypertension, osteoporosis, fibromyalgia, depression and gastritis.

6

Later that month, Dr. Ball examined Plaintiff and found excellent recovery with the left knee.  However, he noted severe degenerative changes in the right knee.

In October 2003, Dr. Ball performed a total knee replacement on Plaintiff's right knee. He noted x-rays showing significant degenerative changes on the right knee, with effusion and medial to lateral instability.  Dr. Ball also noted that flexion and extension of the knee produced pain, grating and crepitus.  Plaintiff was again dismissed using a walker, with home physical therapy and the use of a passive motion machine.

Later that month, Dr. Ball removed Plaintiff's "clips" and ordered continued therapy. Two weeks later, Dr. Ball indicated Plaintiff had finished therapy but was to continue exercises.

In November 2003, Dr. Joseph noted that Plaintiff had done "very well" with her knee replacements.  She was showing signs of increased depression and he increased her medication.

On December 31, 2003, Plaintiff reported to Dr. Ball that she was experiencing swelling again and pain.  Dr. Ball advised her to wear therapeutic hose and take pain medication.

In March 2004, Dr. Joseph completed an Arthritis Residual Functional Capacity Questionnaire.  He indicated he had been treating Plaintiff for arthritis to the hands, spine, and knees, as well as fibromyalgia and depression.  He opined that Plaintiff was in chronic, moderate to severe, pain.  He opined that she was not a malingerer.  He indicated that her symptoms interfered with her attention and concentration on a constant basis and that she

7

was severely limited in her ability to deal with work stress. He endorsed statements indicating that Plaintiff could continuously sit and/or stand for no more than ten minutes at one time and no more than two hours in an eight hour workday; he indicated she would need to lie down during the workday for pain relief. He stated that her symptoms would produce symptoms requiring her to miss work more than three times per month. He also endorsed statements indicating that Plaintiff could never lift and carry ten pounds.

A medical expert who works for the disability determinations service reviewed Plaintiff's medical records. Among other findings, the expert's opinion indicates that Plaintiff had only some limitations with regard to walking; he found that she could walk or stand about six hours in an eight hour workday.

**B.    Administrative Hearing**

**1.    Plaintiff's Testimony**

Plaintiff testified before the ALJ. She claimed disability based on various medical problems, including severe knee pain, fibromyalgia, depression, bulging disc, osteoporosis and high blood pressure.

Plaintiff testified that she continued to experience severe knee pain after the knee replacement surgeries. She said she would have severe pain, for example, when her knees would "pop back," which caused instability in standing and walking. She testified to using a cane for stability.

She testified that she used to be very active. Though she loved to work in the yard, she could hardly do that after the surgeries. She hired someone to clean her home. Plaintiff

said that being active one day meant that she had to stay off her feet the next. She said that her back hurt badly because she was sitting.

Plaintiff testified that the pain medications made her sick. She testified that she uses extra-strength Tylenol, hot showers, elevating her feet for relief. On a Missouri Disability Determinations form, Plaintiff indicated that she also uses ice packs and lies down with her knees bent.

### 2. Vocational Expert Testimony

A vocational expert testified at Plaintiff's hearing. He testified to Plaintiff's past work falling under the classification of truck driver, medium, semi-skilled. The ALJ posed the following hypothetical question to the vocational expert:

> This claimant would be limited to a full range of sedentary work with additional postural limitations precluding her from climbing, balancing, stooping, kneeling, crouching, or crawling.

(R. at 236.)

Based upon this hypothetical question, the vocational expert testified that Plaintiff could not perform any of her past work and that she had no transferrable skills. The vocational expert also testified that Plaintiff was not eligible for direct entry into skilled work. The vocational expert then testified about application of the "Grids" – or applicable rules – to Plaintiff in particular. Those rules provide that applicants under the age of fifty are classified as "younger individuals" whose age is not a significant impediment to adapting to new work situations. 20 C.F.R. 416.963. The vocational expert testified that the rules

dictated a finding of not disabled for the period before December 10, 2002, before Plaintiff turned fifty. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.21.

However, the rules also provide that individuals who are fifty to fifty-four years of age are "closely approaching advanced age," and their age becomes a factor in their ability to adapt to new work environments. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.14 (providing that individuals (a) whose RFCs are limited to sedentary work, (b) who are closely approaching advanced age (age 50-54), (c) who are high school graduates or more, but whose education does not provide for direct entry into skilled work, and (d) whose previous work experience was skilled or semiskilled but whose skills are not transferable to other work, is presumed to be disabled). The vocational expert testified that, after Plaintiff turned fifty, the rules dictated a finding of disability.

The ALJ asked the vocational expert about Plaintiff's additional nonexertional limitations. The vocational expert testified that those limitations would render Plaintiff further disabled.

**C.    ALJ's Decision**

In an opinion dated May 27, 2004, the ALJ determined that Plaintiff was not disabled within the meaning of the Act before she turned fifty years old, but was disabled after she turned fifty. The ALJ set forth the requisite five-step process for making disability determinations. *See* 20 C.F.R. §§ 404.1520, 416.920; *Fastner v. Barnhart*, 324 F.3d 981, 983-84 (8th Cir.2003) (describing the five-step process).

10

The ALJ determined that the combination of Plaintiff's impairments was "severe" within the meaning of the applicable regulations. These impairments included the following: degenerative disc disease of the lumbar spine and cervical spine, advanced osteoarthritis of both knees and status post knee replacement; and a bulging disc.

The ALJ found that Plaintiff maintained a Residual Functional Capacity ("RFC") for work as follows: capacity to perform work at the sedentary exertional level, with the nonexertional limitations of no climbing, balancing, stooping, kneeling, crouching, or crawling. In determining RFC, the ALJ stated that he considered all symptoms, including pain, and the extent to which those symptoms could reasonably be accepted as consistent with the objective medical and other evidence under the requirements of the regulations. He also stated that he considered opinions on Plaintiff's impairments and her resulting RFC.

The ALJ noted the only RFC assessment of record was that of Dr. Joseph, Plaintiff's treating physician. For several reasons, the ALJ gave less weight to Dr. Joseph's opinion to the extent it was inconsistent with the RFC. First, the ALJ noted that, though Dr. Joseph premised his opinion in part on fibromyalgia, neither his notes nor those of other treating or examining sources indicated trigger point or other clinical signs of fibromyalgia. Also, the ALJ stated that Dr. Joseph's treatment notes showed significant findings regarding Plaintiff's knees prior to the knee replacements. Further, the ALJ noted that there was no objective evidence for Dr. Joseph's opinion that Plaintiff could not lift or carry any weight, that she could sit for only short periods, and that she would have to lie down throughout the day. The

ALJ noted that Dr. Joseph had not prescribed strong codeine or morphine-based analgesics ordinarily prescribed for severe pain.

The ALJ considered other medical evidence. He noted Dr. Ball's progress notes, which showed no complications from her knee replacements and that Plaintiff was doing well with therapy. The ALJ commented that Dr. Ball had not suggested the extreme limitations indicated by Dr. Joseph. Accordingly, the ALJ gave less weight to Dr. Joseph's opinion.

After finding that Plaintiff was not capable of returning to her past relevant work, the ALJ considered whether Plaintiff could nevertheless perform other jobs. The ALJ referred to the medical-vocational guidelines of the applicable regulations, acknowledging that they act as a framework for disability decisions where claimants cannot perform all of the extertional demands of work at a given level, or have nonexertional limitations not accounted for by the guidelines.

The ALJ noted that vocational expert testimony was required because of Plaintiff's nonexertional limitations. He noted that the vocational expert testified that Plaintiff could work as an inspector, assembler, or order clerk.

The ALJ considered Plaintiff's age from her alleged onset date onward. Under the applicable rules, the ALJ found that Plaintiff was not disabled from September 18, 2002 until December 10, 2003, her fiftieth birthday. The ALJ determined that, under the applicable rules, Plaintiff was disabled after her fiftieth birthday. Thus, the ALJ found that Plaintiff was disabled once she turned fifty.

## II. Discussion

To establish that she is entitled to benefits, Plaintiff must show that she was unable to engage in any substantial gainful activity by reason of a medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d) and § 1382c(a)(3)(A). This requires that the inability to engage in substantial gainful activity – and not only the impairment – must have existed or be expected to exist for twelve months. *Barnhart v. Walton*, 535 U.S. 212, 217-18 (2002).

Plaintiff had the burden to provide medical evidence to show that she was disabled. *See* 20 C.F.R. §§ 404.1512, 416.912 (2008); *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995). While ALJs have a duty to develop the record fully and fairly, *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir.1993), an ALJ is not required to function as substitute counsel and only needs to develop a reasonably complete record. *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir.1994).

The Court must determine whether there was substantial evidence in the record to support the ALJ's finding that Plaintiff did not have a continuing disability entitling her to benefits during the relevant time period. *Dixon v. Barnhart*, 324 F.3d 997, 1000 (8th Cir. 2003). "Substantial evidence is relevant evidence that reasonable minds might accept as adequate to support the decision." *Id.* (citations omitted). The Court may not decide facts anew, reweigh the evidence or substitute their judgment for that of the ALJ. *See Brockman v. Sullivan*, 987 F.2d 1344, 1346 (8th Cir. 1993). The Court must defer "heavily" to the

Case 3:08-cv-05066-NKL   Document 13   Filed 01/26/09   Page 13 of 22

findings and conclusions of the ALJ. *See Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001).

Plaintiff seems to raise three arguments: (1) the ALJ improperly assessed her nonexertional limitation of pain; (2) the ALJ improperly discounted the RFC evaluation of Dr. Joseph; and (3) the ALJ should have used medical expert testimony to determine whether she met a listed impairment.

### A.    Nonexertional Limitation of Pain

While not directly challenging any credibility decision by the ALJ, Plaintiff argues that the ALJ failed to properly consider her significant, nonexertional limitation of pain. Plaintiff argues that the ALJ's RFC determination relied solely on the "Grids" and did not properly account for her limitation arising from pain, particularly to the extent it caused difficulty concentrating. Also, she argues that the ALJ overlooked treatment notes referencing her complaints of pain.

Plaintiff acknowledges that – as required by the applicable regulations – the ALJ used a vocational expert to assess her abilities. *See Beckley v. Apfel*, 152 F.3d 1056, 1059-60 (8th Cir. 1998) (requiring use of a vocational expert where claimants have nonexertional limitations). However, Plaintiff takes issue with the ALJ not specifically asking the vocational expert to consider the nonexertional limitation of pain at rest.

Plaintiff had the obligation to produce evidence that her symptoms limited her vocational abilities. *See Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). She argues that various evidence supports her claims of pain. She cites to her deteriorating

14

condition during the 2002-2003 time period.  In particular, she underwent a scope of her knees, the reconstruction of both knees, home therapy three times a week, the use of a passive motion machine, and numerous drainage and injection treatments.  She cites to Dr. Joseph's reports of "pain" without activity from February 14, 2002 through August 14, 2003. She notes that Dr. Joseph was also treating her for arthritis of her hands, spine, bulging disc, and depression.

Still, other evidence indicated that Plaintiff's pain did not limit her ability to work. Plaintiff's main problem appeared to have been knee pain, but treating doctors were instructing Plaintiff to return to work despite her knee problems.  For example, treating physician Dr. Black performed arthroscopic surgery on Plaintiff, and noted that she was getting on well, and that she had "minimal pain" in October 2002.  In December 2002, shortly after her alleged onset date, Dr. Black told Plaintiff that she should return to work. During this period, it does not appear that any of Plaintiff's doctors found her limited to the extent that she could not perform the demands of sedentary work.  Plaintiff did opt for total knee replacement surgery in July and October 2003, but she recovered well, and there is little indication that she was unable to walk – or expected to be unable to walk – during the twelve-month period required for a finding of disability.

Similarly, there is no evidence that Plaintiff's apparently worsening back pain limited her to less-than-sedentary work during the relevant period.  In November 2002, Plaintiff told Dr. Joseph her back pain was "relieved" by sitting down.  In December 2002, Plaintiff was referred to Dr. Cole, who noted that she retained normal gait and full strength despite her

15

back pain, though Plaintiff did tell him that sitting for long periods of time made her back hurt more. Dr. Cole diagnosed "early degenerative changes" and told her she needed to change her job to one in which she could change positions.

Plaintiff has not cited to any evidence of significant mental restriction. While she has been treated for pain, none of her doctors have cited clinical evidence concerning difficulty concentrating. Plaintiff was tearful, and expressed concerns over financial difficulties and her inability to return to truck driving. She did receive treatment for depression in the form of antidepressant medication; but there is no indication that she sought any further specialized treatment and no doctor made any observation consistent with a reduced RFC based on depression. The mere presence of a mental disturbance is not disabling per se, absent a showing of severe functional loss establishing an inability to engage in substantial gainful activity. *See Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990). Treatment with antidepressants alone does not show that Plaintiff was unable to work due to a lack of concentration or mental restriction. *See Matthews v. Bowen*, 879 F.2d 422, 424 (8th Cir. 1989). *See also Dunahoo v. Apfel,* 241 F.3d 1033, 1039-40 (8th Cir. 2001) (holding that depression was situational and not disabling because it was due to denial of food stamps and workers compensation and because there was no evidence that it resulted in significant functional limitations).

16

It is clear that the ALJ did consider the limitations Plaintiff did establish, including nonexertional limitations as noted in his decision.[5] The ALJ agreed that Plaintiff was limited to a reduced range of sedentary work. Such a finding represents a very significant limitation on Plaintiff's work capacity. *See Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) (ALJ's finding that Plaintiff was "limited to sedentary work [is] in itself is a significant limitation, which reveals that the ALJ did give some credit to [the treating physician's] medical opinions."). Substantial evidence supports the ALJ's RFC finding, which properly accounted for Plaintiff's complaints of knee pain, and her apparent worsening complaints of back pain.

### B.     Dr. Joseph's Residual Functional Capacity Opinion

Plaintiff argues that the ALJ failed to properly consider Dr. Joseph's RFC opinion. She argues that he was her treating physician. Among other limitations, Dr. Joseph's RFC opinion concluded that Plaintiff would have difficulty concentrating, that she could sit or stand no more than ten minutes at a time, and that she could not lift any weight.

Although the opinions of treating physicians are entitled to substantial weight, *see Chamberlain v. Shalala*, 47 F.3d 1489, 1494 (8th Cir. 1995), such an opinion is not conclusive and must be supported by medically acceptable clinical or diagnostic data. *See Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998); *Trossauer v. Chater*, 121 F.3d 341,

_____

[5] Plaintiff argues that the ALJ failed to consider her nonexertional limitations, and relied solely on the "Grids" in determining whether she was disabled. However, while referencing application of the Grids, the ALJ specifically asked the vocational expert about Plaintiff's nonexertional limitations. The vocational expert stated that these limitations would render Plaintiff "further disabled" than she would be under application of the Grids alone. The ALJ's decision indicates that he considered Plaintiff's established nonexertional limitations.

17

343 (8th Cir. 1997). For example, when a treating physician's notes are inconsistent with his or her RFC assessment, the assessment is not due controlling weight. *See Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006). "Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." 20 C.F.R. § 404.1527(d)(4) (2008).

Contrary to Plaintiff's claim that the ALJ "ignored" Dr. Joseph's opinion, the ALJ explicitly evaluated the doctor's opinion. He gave several reasons for concluding he could not defer to Dr. Joseph's RFC opinion. Among those reasons were that Dr. Joseph's clinical treatment notes did not document limitations as extreme as those found on the RFC form, and that Dr. Ball, Plaintiff's surgeon, did not impose any limitations on Plaintiff that were consistent with such extreme levels of disability.[6] Essentially, the ALJ was concerned that Dr. Joseph's form was not consistent with other medical evidence, including Dr. Joseph's own treatment notes.

The ALJ's concern was justified. There does not appear to be any condition that could

_____

[6] The ALJ gave other reasons for discounting Dr. Joseph's RFC opinion, such as the fact that the doctor had cited fibromyalgia on the residual functional capacity form, but that he had not treated or diagnosed the condition prior to completing the form. Actually, it appears Dr. Joseph did at least mention fibromyalgia in one treatment note. However, the ALJ was correct that Dr. Joseph did not appear to otherwise evaluate Plaintiff for the disease. For example, the doctor made no mention of the trigger points that are both characteristic of fibromyalgia and required for an official diagnosis. *See Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996) (tender spots are "the only symptom that discriminates between [fibromyalgia] and other diseases of a rheumatic character," and the patient must have 11 of 18 of them to be diagnosed with the condition).

18

account for Dr. Joseph's assertion that Plaintiff could lift no weight at all, and certainly no clinical evidence of such profound upper extremity weakness. While Plaintiff did obviously have a painful knee condition, there is little evidence supporting his assertion that she could not even sit for two hours over the course of a workday. Contrary to Dr. Joseph's suggested standing limitations, in February 2003, he noted that Plaintiff said her back pain was "relieved" by sitting. In October 2003, after knee replacement, Dr. Joseph wrote that Plaintiff had made an "excellent recovery." In November 2003, a few months before he completed the RFC form and apparently the last time he saw Plaintiff prior to doing so, he noted that she had done "very well" with both knee replacements. Dr. Joseph's conclusions were also inconsistent with other doctors' treatment notes: as noted above, Dr. Black indicated that Plaintiff was doing well, and that she could work as long as she avoided "bent knee" activities.

Inconsistencies between a doctor's statements and his own opinions or writings is sufficient reason for the ALJ to discredit the doctor's opinion. *See Choate v. Barnhart*, 457 F.3d 865, 871 (8th Cir. 2006) (finding that an ALJ did not err in discounting a treating physician's opinion where treatment notes gave no indication of limitations suggested in the opinion). The ALJ's rationale for disagreeing with Dr. Joseph's RFC opinion is based on substantial evidence. *See Goff v. Barnhart*, 421 F.3d 785, 790–91 (8th Cir. 2005) ("[A]n appropriate finding of inconsistency with other evidence alone is sufficient to discount the opinion.").

### C.     Medical Expert Regarding Listed Impairment

Plaintiff seems to argue that the ALJ should have produced a medical expert to testify as to whether the medical evidence showed that she met or equaled a listed impairment or whether the records reflected conditions which would impact Plaintiff's RFC. It is Plaintiff's burden to show that she meets all of the specified criteria for any listed impairment. *See Marciniak v. Shalala*, 49 F.3d 1350, 1353 (8th Cir. 1995). Medical equivalence to a listing is based on medical findings only. *See* 20 C.F.R. § 404.1526(b) (2007). "Because the listed impairments, if met, operate to cut off further inquiry, they should not be read expansively." *Puhalla v. Astrue,* No. 07-1381 MLB, 2008 WL 2949748 at *5 (D. Kan. July 30, 2008) (citing *Caviness v. Apfel*, 4 F.Supp.2d 813, 818 (S.D. Ind. 1998)). Plaintiff's entire explanation of her argument concerning listed impairments states: "It would appear that perhaps [Plaintiff] would meet or equal listings 1.02 or 1.03 for this time period from September 18, 2002 to December 10, 2003." (Pl. Br. at 10).

Plaintiff here refers to listings for "Major dysfunction of a joint(s) (due to any cause)" found at 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.02; and "Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint," found at 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.03 (2008). The listing for "major dysfunction of a joint(s) (due to any cause)," requires Plaintiff to show that she suffered from gross anatomical deformity, chronic joint pain, and stiffness with signs of limitation of motion, and corresponding imaging with involvement of one major weight bearing joint. The listing further requires that the imaging test show "joint space narrowing, bony destruction, or ankylosis" of the affected joint. Vitally, she must also demonstrate involvement of one weight-bearing joint, "resulting in an inability to ambulate

20

effectively." 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.02. Section 1.03 is similar, in that Plaintiff must show an inability to ambulate effectively for twelve months as a result of joint replacement or other surgery.

Plaintiff has not demonstrated that she suffered from an inability to ambulate effectively for either reason for the required twelve-month period. An inability to ambulate effectively is an "extreme" limitation, examples of which include a claimant who requires two crutches or canes, cannot perform normal activities such as going to the bank or using public transportation, or cannot maintain a reasonable pace in walking one block on uneven surfaces. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00(B)(2)(b). Plaintiff clearly has had severe knee problems, but she has not demonstrated the requirements of the listing. Dr. Black failed to note any difficulty walking, and there is no indication that he ever prescribed long-term use of a cane or walker. In fact, he indicated that she should go back to work. She could still clearly walk sufficiently to complete normal activities: she told Dr. Black she had aggravated her knee pain, but only after walking a lot and going to the grocery store the previous day. Even after Plaintiff's knee replacement surgery, Plaintiff has failed to point to any clinical evidence of difficulty walking. Plaintiff has cited no evidence of an inability to ambulate effectively to the extent required by the listing.

Plaintiff nevertheless argues that the ALJ should have produced a medical expert to opine on whether she met the relevant listed impairments.[7] Certainly, given Plaintiff's failure

---

[7] Medical expert testimony is sometimes required in order to determine whether a claimant has impairments that are medically equivalent to a listed impairment,

Case 3:08-cv-05066-NKL   Document 13   Filed 01/26/09   Page 21 of 22

to show any lasting substantial walking impairment, it is unlikely she could ever be found to have an equivalent walking impairment.

Still, though not specifically considered in the ALJ's decision, a medical expert who works for the disability determinations service did review Plaintiff's case. His medical judgment was that Plaintiff's claims of inability to ambulate were not supported by her medical records. Plaintiff gives no indication that records which were not before him would have shown otherwise. This is sufficient medical expert consideration under the applicable rulings. *See* S.S.R. 86-8 ("The Disability Determination Services physician's documented medical judgment as to equivalency meets this regulatory requirement."). Plaintiff failed to meet her burden of showing that she met a listed impairment.

## III.     Conclusion

Accordingly, it is hereby ORDERED that Plaintiff's petition is DENIED.


                                                   s/ Nanette K. Laughrey
                                                   NANETTE K. LAUGHREY
                                                   United States District Judge

Dated:  January 26, 2009
Jefferson City, Missouri

---

but Plaintiff does not argue that is the case here. *See* S.S.R. 86-8 available at
http://www.ssa.gov/OP_Home/rulings/di/01/SSR86-08-di-01.html ("Any decision as to
whether an individual's impairment or impairments are medically equivalent of a listed
impairment must be based on medical evidence demonstrated by medically acceptable clinical
and laboratory diagnostic techniques, including consideration of a medical judgment about
medical equivalence furnished by one or more physicians designated by the [Commissioner]).

Case 3:08-cv-05066-NKL   Document 13   Filed 01/26/09   Page 22 of 22